# In the United States Court of Federal Claims

No. 24-1893C

(Filed under seal: July 2, 2025)

(Filed: July 14, 2025)

|  |  |
|---|---|
| **GOLDEN IT, LLC,** | ) |
|  | ) |
| *Plaintiff,* | ) |
| **v.** | ) |
|  | ) |
| **THE UNITED STATES,** | ) |
|  | ) |
| *Defendant,* | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **ACCELGOV, LLC; and** | ) |
|  | ) |
| **CCS LINTECH JV, LLC,** | ) |
|  | ) |
| *Defendant-Intervenors.* | ) |

_____

*Jon D. Levin*, Womble Bond Dickinson LLP, Huntsville, AL, for Plaintiff.

*Rafael Shapiro*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With him on the briefs were *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Acting Deputy Director, Commercial Litigation Branch, Civil Division; and *Kenneth Redden* and *Nicholas Holtz*, Office of General Counsel, U.S. Environmental Protection Agency.

*W. Brad English*, Maynard Nexsen PC, Huntsville, AL, for Defendant-Intervenor AccelGov, LLC. With him on the briefs were *Emily J. Chancey*, *Michael R. Pillsbury*, *Taylor R. Holt*, *Hunter M. Drake*, and *Holdon D. Guy*.

*Adam K. Lasky*, Seyfarth Shaw LLP, Seattle, WA, for Defendant-Intervenor CCS Lintech JV, LLC. With him on the briefs were *Ken M. Kanzawa* and *Erica L. Bakies*, Seyfarth Shaw LLP, Washington, DC.

## OPINION AND ORDER[*]

**SOLOMSON, Chief Judge.**

In this Court's experience, Federal government procurement disputes — colloquially called "bid protests"[1] — all too often arise because of poorly crafted documentation: either the solicitation is so complex and difficult to follow that it requires a Ph.D. to unravel, or the disappointed offeror's proposal lacks sufficient clarity. Sometimes, the former causes the latter: the solicitation is so confusing that offerors have trouble writing a compliant or responsive proposal. Or, in another variation on the same theme, agency procurement officials have difficulty applying their own solicitation's evaluation scheme correctly or fairly across competitors. The procurement at issue appears to be plagued by at least some of these problems. This case also raises several important questions: when may this Court find that a plaintiff has failed to prove prejudice or that the government has demonstrated harmless error; and, relatedly, how much detail must the administrative record contain for the government to have adequately justified its decision (and thereby avoid a remand to show more of its work)?

Here, plaintiff, Golden IT, LLC ("Golden"), challenges the decision of Defendant, the United States — acting by and through the Environmental Protection Agency ("EPA") — not to award Golden a blanket purchase agreement ("BPA") as part of a $225 million procurement of information technology support services. Golden alleges that the EPA made three errors in its technical evaluation of Golden's quote that, *collectively*, cost Golden a BPA award. For the reasons explained below, this Court concludes that Golden has not met its burden to demonstrate that the government's procurement decision is

---

[*] On July 2, 2025, this Court issued this opinion and order under seal and provided the parties the opportunity to file proposed redactions by July 14, 2025. ECF No. 68. The parties jointly filed a proposed redacted version on July 11, 2025. ECF No. 71. This Court incorporates those redactions in this public version of the opinion. Redacted words and phrases have been replaced with [ * * * ]. The name of Golden's proposed key personnel has been replaced throughout the opinion with [KP].

[1] "[T]ypically, there is a distinction between procurements conducted pursuant to FAR Parts 14 and 15, on the one hand, and FAR Part 8 procurements, on the other: the former solicit bids or proposals from bidders or offerors, respectively, while the latter solicits quotations." *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 91 (2020) (emphasis omitted); *see also* FAR 2.101 ("*Offer* means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called 'bids' or 'sealed bids'; responses to requests for proposals (negotiation) are offers called 'proposals'; however, responses to requests for quotations (simplified acquisition) are 'quotations', not offers.").

arbitrary and capricious, that any putative error in this procurement is prejudicial, or that a remand is otherwise warranted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    The EPA's Request for Quotations

On March 6, 2024, the EPA issued a Request for Quotations ("RFQ"),[3] seeking contractors to provide Multi-Regional Information Technology Support Services ("MRITSS") — essentially, IT services for the agency's offices across the country — via multiple-award BPAs.  AR 252; *see also* AR 1366.[4]

The RFQ indicated that the agency "intends to award six (6) to ten (10) BPAs," but cautioned that "the EPA reserves the right to award more, less, or even no BPAs." AR 1366; *see also* AR 1425 ("The Government anticipates awarding 6–8 BPAs.").  The

---

[2] This background section constitutes this Court's findings of fact drawn from the administrative record.  Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires this Court to "make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).  Other factual findings are contained in the Discussion section of this opinion, *see infra* Section IV.  Citations to the corrected administrative record, ECF No. 37, are denoted as "AR" followed by its page number.

[3] The GAO explains that an RFQ is little more than a request for information:

> The submission of a bid or proposal constitutes, by its very nature, an offer by a contractor that, if accepted, creates a binding legal obligation on both parties.  Because of the binding nature of bids and offers, they are held open for acceptance within a specified or reasonable period of time . . . .
>
> A quotation, on the other hand, is not a submission for acceptance by the government to form a binding contract; rather, vendor quotations are purely informational.  *In the RFQ context, it is the government that makes the offer*, albeit generally based on the information provided by the vendor in its quotation, and no binding agreement is created until the vendor accepts the offer.  FAR § 13.004(a).

*Sea Box, Inc.*, B-405711, 2012 CPD ¶ 116, 2012 WL 924951, *2–*3 (Mar. 19, 2012) (internal citations omitted) (emphasis added).

[4] The EPA amended the initial RFQ eleven times for various purposes; the final amendment was issued on June 5, 2024.  AR 1530.

government estimated that the overall value of the procurement was approximately $225,000,000 over nine years.  AR 1398.

## B. The MRITSS Procurement's Quote Submission and Evaluation Process

The MRITSS procurement was a multi-phase, competitive 8(a) small business set-aside[5] procurement, conducted pursuant to FAR 8.4 (Federal Supply Schedules).  AR 1366 (the RFQ specifically cautioning would-be quoters that "[t]his is not a FAR Part 15 negotiated procurement").  Section VI.1 of the RFQ (Basis for Award) provided that the EPA would award BPAs based on the quotes that best conformed to the RFQ's requirements and represented the best value to the government.  AR 1424–25.  The RFQ defined the "best value basis" as the "highest technically rated quoters with a fair and reasonable price."  AR 1424.  The overall technical rating, in turn, depended on four non-price factors, listed here in descending order of importance:  (1) Experience (Factor 1); (2) Technical Capability (Factor 2); (3) Management Approach (Factor 3); and (4) Past Performance (Factor 4).  *Id.*  These four non-price factors were significantly more important than the price factor.  *Id.*

The RFQ provided for a two-phase procurement process.  AR 1409–10 (RFQ § V.3), 1424 (RFQ § VI.1).  For Phase I, quoters were required to submit a single volume with three sections:  Section I to address basic corporate information; Section II to address questions related to experience with service desk tools and systems, IT staffing, IT staff education and training, and IT staff performance management; and Section III to address capabilities, differentiators, and additional corporate data.  AR 1413–14 (RFQ § V.5.1.1).  During Phase I, the EPA evaluated only Factor 1 (Experience).  AR 1424–25 (RFQ § VI.4).

Based on the results of Phase I, the EPA advised the highest-rated quoters to participate in Phase II, and notified the lower-rated quoters that "they were unlikely to be viable competitors."  AR 1424, 6771–73.  During Phase II, quoters submitted three volumes: Volume I (Business Section), AR 1415–19 (RFQ § V.5.2.1); Volume II (Technical Section), AR 1419–23 (RFQ § V.5.2.2); and Volume III (Price Section), AR 1422–23 (RFQ § V.5.2.3).  Volume II was further subdivided into Section I (Technical Capability) (Factor

---

[5] https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program (https://perma.cc/4BPV-EZ8V).  Because this procurement "is a total set aside for SBA certified 8(a) firms[,] [o]nly quotes submitted by SBA certified 8(a) prime contractors will be accepted by the government."  AR 1366.

2), Section II (Management Approach) (Factor 3), and Section III (Past Performance) (Factor 4).  AR 1419–22.

For each of the first three evaluation factors — Experience, Technical Capability, and Management Approach — the agency used a three-tier adjectival rating system to assess the degree to which a quoter "has the experience to meet the Government's service requirements in accordance" with the MRITSS Performance Work Statement ("PWS"): (1) High Confidence; (2) Some Confidence; or (3) Low Confidence.  AR 1425–26.[6]

Finally, the agency determined which quoters had a "fair and reasonable price." AR 1427.  The RFQ required the agency to award BPAs to the "highest technically rated quoters with a fair and reasonable price."  AR 1424.  The RFQ did not set any parameters for how the EPA had to draw a line between what the agency assessed as the "highest technically rated quoters" and everyone else.

The RFQ has multiple problems — particularly in the quote instructions and evaluation criteria regarding proposed key personnel, one of the central issues in this case.  For example, the RFQ instructions for Factor 2 (Technical Capability) required each quoter to "provide its Technical Capability using the format in Attachment #5 [to the RFQ], organized by the four core management components, the six regional IT support services areas and the eight ancillary IT support service areas."  AR 1419 (RFQ § V.5.2.2(I)) (instructing that the "Quoter shall summarize the size, scope, and complexity of work performed by the Quoter and (if applicable) their subcontractors"). Attachment 5, in turn, is entitled "Technical Factor 2 Matrix."  It instructs quoters to address PWS § 3.1.4 Key Personnel by providing "one (1) resume for IDV level Program Manager (PgM) who shall be responsible for day-to-day oversight management of the contract in accordance with MRITSS PWS 3.1.4 (Appendix 1) under Volume II – Technical Section II – Management Approach (Factor 3)."[7]  AR 1468, 1518.  This requirement is patently ambiguous, if not downright confusing.  Does the part of a quoter's submission addressing Attachment 5 get evaluated under Factor 2 (Technical Capability) — as its title suggests — or under Factor 3 (Management Approach), as referenced in the key

---

[6] For Factor 4 (Past Performance), the agency used the following five-tiered adjectival rating scale: (1) Substantial Confidence; (2) Satisfactory Confidence; (3) Limited Confidence; (4) No Confidence; or (5) Unknown Confidence (which was a "neutral" rating).  AR 1426–27.

[7] IDV stands for "Indefinite Delivery Vehicle."  AR 1247.

personnel instruction?  AR 1468.[8]  The RFQ did not address that inherent contradiction, and it appears that no party even attempted to clear up this contradiction via a pre-award solicitation challenge.  The interpretative conundrum is further compounded by the RFQ's instruction for Factor 3: "Offerors should provide one (1) resume for proposed IDV level Program Manager (PgM) to support Service Management at the Contract and Task Order level in accordance with PWS 3.1.4 (Appendix 1)."  AR 1420 (RFQ § V.5.2.2(II)).

The RFQ gets even more confusing.  The RFQ's evaluation scheme provides that the "Government will evaluate . . . those items stated in Section V.4.2.2 (I)" for Factor 2 and "those items stated in [Section] V.4.2.2(II)" for Factor 3.  AR 1426 (RFQ §§ VI.5.1 – VI.5.2).  But those referenced RFP sections do not exist.  The intended reference is quite obviously RFQ § V.5.2.2.  AR 1419–20; *see also* AR 1432 (agency answer to quoter Question 110, indicating that RFQ section numbering had been corrected).  But other EPA answers to quoters' questions compound the confusion.  For example, Question 81 began by noting that "Attachment 5 is listed as a component within Volume II (Section I: Technical Capability)," and asked how Attachment 5 should be included in a quote.  AR 1431.  The EPA responded that "[t]he format in Attachment 5 must be used but it can be copy/pasted into the Offerors['] overall Technical Capability."  *Id.*  That answer implies that the key personnel resume for the proposed PgM will be evaluated in Factor 2.  On the other hand, Question 93 asked the EPA to "clarify [whether] the key personnel . . . need to be identified at the BPA level[,]" whether a "resume [is] required," and, if so, to "specify in the solicitation where the resume should be provided."  AR 1432.  This time, the EPA responded that a resume for the proposed IDV level PgM should be provided as part of "Technical Section II – Management Approach."  *Id.*; *see also id.* at Question 107 ("As part of the submission for Volume II-Technical Section II- Management Approach[,] Offerors should provide one (1) resume for proposed IDV level Program Manager (PgM) to support Service Management at the Contract and Task Order level in accordance with PWS 3.1.4 (Appendix 1)."); AR 1433 (Question 121) (same, referencing "updated Attachment 5").  This, of course, suggests that the EPA would review the key personnel resume as part of Factor 3, and not Factor 2.

---

[8] PWS § 3.1.4 covers "Key Personnel" and requires the contract awardees to "provide an IDV level [PgM] who shall be responsible for day-to-day oversight and management of the contract."  AR 1264.

It does not get better from here. The RFQ instructed quoters to adhere to document "TE 3[-]7 for IDV Program Manager requirements."[9] AR 1433 (EPA's answer to quoter Question 129). The TE 3-7 document ("Staffing Plan and Key Personnel"), in turn, provided that the IDV Level Program Manager would be "[r]esponsible for day-to-day oversight and management of the contract." AR 9567. TE 3-7 also enumerated the required program manager qualifications, which included a education requirement, certification requirements, experience level requirements, and a minimum clearance level. AR 9567–68. Specifically, the experience requirements were: (1) "10 years of experience managing IT Support Service Programs with similar scope and complexity"; (2) "Demonstrated experience managing teams of IT professionals supporting a large AO"; (3) "Demonstrated experience interfacing with customer senior leadership"; and (4) "Familiarity with Federal IT security requirements." *Id.* Once again, however, the RFQ remained ambiguous as to whether the agency would evaluate a proposed program manager (key personnel) under Factor 2 or Factor 3. *See* AR 1433 (Question 135) (EPA explaining that "[k]ey personnel resume should be included with the management approach section" but that "offerors can elaborate on key personnel in attachment 5").[10]

Given these gross ambiguities and Golden's failure to challenge them pre-award, Golden must live with whatever interpretation the government implicitly adopted as part of its evaluation. *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 576 (2021) ("When a Solicitation is patently ambiguous, the government remains free to select a reasonable interpretation, as it sees fit, during the evaluation and award segments of the procurement process." (citing cases)); *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."); *Harmonia Holdings Grp., LLC v. United*

---

[9] A "TE" is a "Technical Exhibit" attached to the PWS. *See* AR 1253–54 (listing and describing TEs).

[10] "[T]he questions and answers posed during an agency solicitation . . . play a central role in the interpretation of the solicitation provisions." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016); *see also BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 689 n.15 (2012) ("GAO decisions support the view that such answers, when circulated to all offerors as an attachment to an amendment signed by the contracting officer, constitute an amendment of the solicitation."); *Scientific Research Corp.*, B–260478, 95–2 CPD ¶ 8, 1995 WL 404157, at *5 (Comp. Gen. July 10, 1995) (concluding that "information disseminated during the course of a procurement that is in writing, signed by the contracting officer, and sent to all offerors, meets all the essential elements of a solicitation amendment and will therefore bind both the offerors and the agency").

*States*, 20 F.4th 759, 766–67 (Fed. Cir. 2021) (explaining that the *Blue & Gold* waiver rule "prevents a bidder who is aware of a solicitation defect from waiting to bring its challenge [until] after the award in an attempt to restart the bidding process").

### C.  The Agency's Phase I Evaluations

On March 29, 2024, Golden submitted its Phase I quote.  AR 2134.  After the evaluation of Phase I submissions, Golden and sixteen other quoters "were advised to proceed to Phase II."  AR 6515, 6697 ("Offerors who were not among the most highly rated were advised that they are unlikely to be viable competitors, along with the general basis for the Government's advisory recommendation.  The intent of this advisory notice [was] to minimize development and other costs for those Offerors with little to no chance of receiving an award.").

Sixteen quoters, including Golden, participated in Phase II:  AccelGov, LLC; ASRC Federal Cyber, LLC ("ASRC"); CCS Lintech JV, LLC ("CCS Lintech"); Cherokee Nation Systems Solutions; Conceras LLC; CPM Enterprises, LLC; [ * * * ]; [ * * * ]; Gi4, LLC; [ * * * ]; ITfrastructure, Inc.; [ * * * ]; MSM Technology, Inc.; [ * * * ]; and ResolveSoft, Inc.  *Id.*[11] Golden — and all the other quoters who ultimately participated in Phase II — received a "High Confidence" rating for Factor 1 (Experience).  AR 7011.

### D.  The Agency's Phase II Evaluations

As explained *supra*, quoters in Phase II had to address the remaining evaluation factors: Factor 2 (Technical Capability); Factor 3 (Management Approach); and Factor 4 (Past Performance).  AR 1415–23.  Golden submitted its Phase II quote on June 6, 2024. AR 4434.  At the conclusion of Phase II, eleven of the sixteen quoters received an overall technical rating of "High Confidence."  AR 7011.

The following chart depicts the evaluations of the Phase II quoters; it is taken directly from the EPA's Technical Evaluation Panel ("TEP") Report:

---

[11] One quoter advised to participate in Phase II — [ * * * ] — elected not to continue in the procurement process.  AR 6515.

| Offeror | Factor 1: Experience | Factor 2: Technical Capability | Factor 3: Management Approach | Factor 4: Past Performance | Overall Rating |
|---|---|---|---|---|---|
| AccelGov LLC | High Confidence | High Confidence | High Confidence | Satisfactory Confidence | High Confidence |
| ASRC | High Confidence | High Confidence | High Confidence | Satisfactory Confidence | High Confidence |
| CCS Lintech JV | High Confidence | High Confidence | High Confidence | Substantial Confidence | High Confidence |
| Cherokee (CNSS) | High Confidence | High Confidence | High Confidence | Satisfactory Confidence | High Confidence |
| Conceras | High Confidence | High Confidence | High Confidence | Satisfactory Confidence | High Confidence |
| CPM Enterprises | High Confidence | High Confidence | High Confidence | Substantial Confidence | High Confidence |
| Gi4 LLC | High Confidence | High Confidence | High Confidence | Satisfactory Confidence | High Confidence |
| Itinfra | High Confidence | High Confidence | High Confidence | Satisfactory Confidence | High Confidence |
| MSM Technology | High Confidence | High Confidence | High Confidence | Substantial Confidence | High Confidence |
| [ * * * ] | High Confidence | High Confidence | Some Confidence | Satisfactory Confidence | High Confidence |
| ResolveSoft | High Confidence | High Confidence | High Confidence | Satisfactory Confidence | High Confidence |
| [ * * * ] | High Confidence | Some Confidence | Some Confidence | Satisfactory Confidence | Some Confidence |
| [ * * * ] | High Confidence | Some Confidence | High Confidence | Substantial Confidence | Some Confidence |
| Golden IT LLC | High Confidence | Some Confidence | High Confidence | Satisfactory Confidence | Some Confidence |
| [ * * * ] | High Confidence | Low Confidence | High Confidence | Satisfactory Confidence | Some Confidence |
| [ * * * ] | High Confidence | Low Confidence | Some Confidence | Satisfactory Confidence | Some Confidence |

Summary Phase II: Offeror Consensus Ratings

AR 6686, 7011.  The EPA ultimately awarded BPAs to ten quoters.[12]  AR 7011, 7149. Golden was not amongst them.  AR 9242–46.

While all ten BPA awardees received an "Overall Rating" of "High Confidence" for the non-price factors, the agency assessed that it only had "Some Confidence" in Golden.  AR 7011, 9243.  The Overall Ratings appear to reflect the agency's combined assessment in the aggregate of Factors 1–4 for each quoter.  AR 7011–44.[13]  Thus, while the ten awardees received a rating of "High Confidence" for the first three Factors[14] — and "Substantial" or "Satisfactory" confidence for each of Factor 4 (Past Performance) — Golden's ratings were lower.  Golden received a rating of "High Confidence" for Factor 1 (Experience) and Factor 3 (Management Approach), but only "Some Confidence" for

---

[12] There were originally eleven awardees, but the agency subsequently determined that [ * * * ] was ineligible for award.  AR 7172–73.

[13] It is unclear precisely how the agency determined its "Overall Ratings" — the term is never mentioned, let alone defined, in the RFP's "Evaluation Factors for Award," *see* AR 1424–28.

[14] [ * * * ] — determined ineligible as stated above — received a rating of "Some Confidence" for Factor 3 (Management Approach).

Factor 2 (Technical Capability) and "Satisfactory Confidence" for Factor 4 (Past Performance). The apparently critical difference between Golden and its successful competitors was Factor 2 (Technical Capability).

On October 28, 2024, the EPA informed Golden that it would not receive a BPA. AR 9242–46. The agency's evaluation identified three areas in which Golden's technical capability fell short: (1) resource management; (2) change management; and (3) key personnel. AR 9244 (discussing PWS §§ 3.1.1.4 (resource management), 3.1.1.5 (change management); and 3.1.3.2 (key personnel)).[15] Overall, citing a risk of "potential poor contractor performance, inexcusable delays in service, and loss of Government resources" which "could cause negative impacts to EPA operations and programs," the EPA assigned Golden a rating of "Some Confidence" for Factor 2 (Technical Capability). AR 7090; *see also* AR 9244–45.

In resolving Golden's motion for judgment on the administrative record ("MJAR"), as explained *infra*, this Court focuses primarily on how Golden addressed the key personnel issue. Beyond simply referencing Attachment 5, the Factor 2 section of Golden's quote contains almost no details regarding its proposed key personnel. AR 4596. In its completed Attachment 5, Golden identified [KP] as its proposed IDV-level project manager. AR 4650. Golden described [KP] as having "20 years of experience as a federal government contractor at Multiple Departments." *Id.* (Attachment 5, addressing PWS § 3.1.4). But Golden made no reference to [KP]'s resume or [KP]'s years of experience managing IT support service programs. *Id.*

The EPA evaluated [KP]'s under Factor 2 — a decision Golden does not challenge. Nor could it do so at this stage of the game. *See Blue & Gold*, 492 F.3d at 1313. But even if the agency should have considered key personnel under Factor 3, Golden's quote in that section contains few additional details about [KP] or [KP]'s relevant experience. For example, Golden identifies [KP] as "an experienced PMP certified professional with deep expertise in managing similar programs," but Golden doesn't provide any supporting details, nor does it reference [KP]'s resume. AR 4599. Indeed, at the very end of the Factor 3 section of Golden's quote, Golden uses the same verbiage as in Attachment 5, noting simply that [KP] has "20 years of experience as a federal government contractor at multiple Departments." AR 4611. Once again, Golden makes no mention of [KP]'s years of experience managing IT support service programs. In this section of its quote,

---

[15] The document contains an error: there is no § 3.1.3.2. Key personnel is addressed in PWS § 3.1.4. AR 1264.

Golden at least notes that [KP]'s "resume is included in Appendix A of this document." *Id.* But a reader — whether an agency evaluator or this Court — is otherwise on his or her own in extracting specific conclusions from [KP]'s resume about [KP]'s experience, *see* AR 4627-29. For example, [KP]'s resume contains a high-level summary describing [KP] as having "20 years of experience working *on software development projects* at multiple government agencies." AR 4627 (emphasis added). But there is no other narrative in [KP]'s resume calculating — or otherwise explaining how to calculate — [KP]'s years of experience managing *IT support service programs*.

The EPA ultimately concluded that [KP] — Golden's "provided key personnel" — "do[es] not meet the requirement as described in the PWS." AR 9244. The EPA noted [KP]'s "heavy [software] development background," but criticized [KP]'s lack of "experience managing IT Support Service Programs with similar scope and complexity to MRITSS and experience managing teams of IT professionals supporting a large area of operations." *Id.* This negative assessment of [KP], among other things, led to Golden's "Some Confidence" rating for Factor 2 (Technical Capability).

### E. Golden Challenges the EPA's Procurement Decision

On November 18, 2024, following the EPA's post-award debrief, Golden filed its complaint in this Court. ECF No. 1. On January 8, 2025, Golden filed its amended complaint along with its MJAR. ECF No. 34 ("Pl. MJAR"); ECF No. 35 ("Am. Compl."). In Golden's amended complaint and MJAR, Golden asserts that: (1) the EPA's evaluation of Golden's quote under Factor 2 (Technical Capability) was arbitrary, capricious, and irrational, Am. Compl. at ¶¶ 50–101; Pl. MJAR at 12; (2) the EPA used an arbitrary and capricious cutoff in deciding which quoters would not receive a BPA — by improperly turning "insufficiencies" into disqualifying "deficiencies," Am. Compl. at ¶¶ 102–111; Pl. MJAR at 34; (3) the EPA's source selection decision was arbitrary and irrational because it relied on the allegedly improper evaluations, Am. Compl. at ¶¶ 112–113; Pl. MJAR at 34–35; and (4) Golden is entitled to a permanent injunction, Am. Compl. at ¶¶ 114–120; Pl. MJAR at 35.

On January 29, 2025, the government filed its cross-MJAR and response. ECF No. 40. On that same date, defendant-intervenors — AccelGov and CCS Lintech — each filed their respective cross-MJARs in support of the government's position.[16]

---

[16] ASRC also initially participated in this case as a defendant-intervenor. But ASRC later filed an unopposed motion for leave to not participate in oral argument. ECF No. 56. In addressing

ECF No. 39, ECF No. 41 ("CCSL MJAR").  On February 12, 2025, Golden filed its reply. ECF No. 43 ("Pl. Rep.").  On February 26, 2025, the government filed its reply, ECF No. 46 ("Def. Rep."), and intervenors AccelGov and CCS Lintech filed their respective replies in support of the government.  ECF Nos. 47, 48.  On March 25, 2025, this Court held oral argument on the parties' pending motions.  ECF No. 67 ("Tr.").

## II.    JURISDICTION

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, provides this Court with

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).  "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).

No party challenges either this Court's jurisdiction or Golden's standing to pursue its case.  Nevertheless, this Court has an independent duty to verify that it has jurisdiction over this matter and that Golden has standing to pursue its action.  This Court finds that it has jurisdiction, and that Golden has standing:  Golden was an actual offeror, as it submitted a timely quote prior to the RFQ's deadline.  And Golden alleges facts that, if proven, demonstrate that but for the EPA's *cumulative* errors, Golden would have had a substantial chance at obtaining a BPA award.  *REV, LLC v. United States*, 91 F.4th 1156, 1164 (Fed. Cir. 2024) ("In assessing whether a party was prejudiced [for standing purposes] by purported errors in a procurement process, we must assume that the party will, if permitted to proceed with its claim, prevail on the merits."); *see also Info. Tech. &*

---

ASRC's motion, this Court ordered that ASRC's counsel either had to be present at oral argument to answer questions, or, if ASRC was fully satisfied with the government's briefing, ASRC could choose instead to withdraw its briefs (and then counsel would not need to attend the oral argument).  ECF No. 57.  On March 13, 2025, ASRC withdrew its briefs, effectively exiting this case.  ECF No. 58.

*Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 567–68 (2021); *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 687 (2022).

Accordingly, this Court will proceed to the merits of Golden's procurement challenge.[17]

## III.    STANDARD OF REVIEW

### A.  Administrative Procedure Act Review in Procurement Protest Cases

Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review from the Administrative Procedure Act ("APA") § 10(c), 5 U.S.C. § 706.  *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019) ("In reviewing a grant of judgment upon the administrative record, . . . we review the agency's actions according to the standards set forth in the Administrative Procedure Act."); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("[W]hen read together, [28 U.S.C. §] 1491(b)(4) and [5 U.S.C. §] 706(2)(A) compel the conclusion that section 1491(b)(4) only incorporates the arbitrary or capricious standard of review of section 706(2)(A).").

In applying the APA standard of review, this Court considers a challenged agency procurement decision to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  For a plaintiff to succeed on the merits, it must demonstrate at a minimum that either: "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (explaining that the APA standard of review requires a court to determine whether "(1) the procurement official's decision lacked a

---

[17] This Court considers prejudice at both the standing and merits stages of a case:

> For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions.  But once we find that a party has standing, we must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence.

*Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226–27 (Fed. Cir. 2019) (internal citations omitted).

rational basis; or (2) the procurement procedure involved a violation of regulation or procedure" (quoting *PGBA*, 389 F.3d at 1225)).

An agency's decision is arbitrary and capricious — and thus lacks a rational basis — where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (quoting *Ala. Aircraft Indus.*, 586 F.3d at 1375). On the other hand, "[a]lthough 'we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Snyder v. McDonough*, 1 F.4th 996, 1005 (Fed. Cir. 2021) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)); *see also Harrington v. Dep't of Veterans Affs.*, 2025 WL 655546, at *3 (Fed. Cir. Feb. 28, 2025) ("[W]e do not require perfect explanations [and] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (quoting *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382–83 (Fed. Cir. 2016) (citation omitted))).

To succeed on the merits, however, a plaintiff must do more than show *some* agency error; the plaintiff must also demonstrate that an agency's error was prejudicial. "[T]here is no starting point of presumed prejudice[.]" *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). Rather, the plaintiff bears the burden of demonstrating prejudice. *Shinseki v. Sanders*, 556 U.S. 396, 409 ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Sys. Stud. & Simulation*, 22 F.4th at 996–97 ("[T]he challenger of agency action generally bears the burden of showing that an error was harmful — that is, that it was prejudicial."). Accordingly, this Court must always determine whether an agency's error is prejudicial "before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation*, 22 F.4th at 997 (citing *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 n.6 (Fed. Cir. 2021) ("The APA does not provide an exception to the prejudicial-error rule for arbitrary and capricious action.")).[18]

---

[18] In *Magellan Technology, Inc. v. FDA*, the United States Court of Appeals for the Second Circuit similarly explained the APA's prejudice requirement: "Judicial review of agency action

Our appellate court — the United States Court of Appeals for the Federal Circuit — has explained that, to prove prejudice, a plaintiff "must show there is a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Tinton Falls*, 800 F.3d at 1358 (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)). In that regard, a plaintiff must demonstrate "more than a bare possibility of receiving the award." *Blue Water Thinking, LLC v. United States*, 2025 WL 763565, at *9 (Fed. Cl. Mar. 11, 2025) (quoting *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016)); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (affirming the trial court's determination that the plaintiff had not demonstrated a substantial chance of award because its "argument rest[ed] on mere numerical possibility, not evidence").

### B. A Trial on the Administrative Record Requires this Court to Engage in Fact Finding, Including for the Prejudice Analysis

Procurement challenges pursuant to 28 U.S.C. § 1491(b) are resolved via motions for judgment on the administrative record, RCFC 52.1(c), a process "properly understood as intending to provide for an expedited trial on the record." *Bannum*, 404 F.3d at 1356. The process is "designed to provide for trial on a paper record, *allowing fact-finding by the trial court*." *Id.* (emphasis added).[19] In deciding cross-MJARs, this Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020) (quoting *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018)); *see Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).[20]

---

incorporates the APA's prejudicial error rule. Under the prejudicial error rule, a court will not disturb an agency's decision if it determines that the outcome of the agency action would be the same absent agency error." 70 F.4th 622, 629 (2d Cir. 2023) (citing 5 U.S.C. § 706 and *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.")).

[19] "The primary difference between a typical trial and one conducted on the administrative record is that, in the latter, new evidence ordinarily may not be considered. Both the nature of APA review and this Court's rules 'restricts the evidence to the agency record, as may be supplemented consistent with [the law of this circuit].'" *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 274 (2024) (alteration in original) (quoting *Bannum*, 404 F.3d at 1356).

[20] *See also Noble Supply & Logistics LLC v. United States*, 168 Fed. Cl. 439, 447 (2023) ("[T]he court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record." (citing *Bannum*, 404 F.3d at 1355)); *Navarre Corp. v. United States*, 168 Fed. Cl. 361, 367–68 (2023) (explaining that "the parties are limited to the administrative record, and the Court must make findings of fact as if it were

The Federal Circuit instructs that we are "*required* to determine" whether "errors in the procurement process significantly prejudiced [the plaintiff]," *Bannum*, 404 F.3d at 1353 (emphasis added).  Thus, the trial court must "make factual findings on prejudice from the record evidence." *Id.* at 1356.  In other words, when performing the mandatory prejudice analysis, the trial court performs its ordinary fact-finding role and does not defer to the agency.  Thus, the Federal Circuit "reviews such [factual] findings [only] for clear error." *Id.* at 1354.  Although we must defer to the agency's fact finding with regard to its assessment of, for example, offeror proposals, the Federal Circuit has explained that we need not remand to the agency for fact finding on prejudice where the record enables the Court to engage in such fact finding itself in the first instance.  *Id.* (contrasting the APA standard of review with the "Court of Federal Claims prejudice determination," which "assesses whether an adjudged violation of law warrants setting aside a contract award").

In sum, "the trial court's factual determination on prejudice . . . is entitled to review for clear error like any finding in a bench trial, and the special concerns applicable to bid protest actions do not alter that review here." *Bannum*, 404 F.3d at 1357; *see also Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1319 (Fed. Cir. 2025) ("Prejudice is a factual question that we review for clear error." (quoting cases)); *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024) ("We review determinations of standing under the Tucker Act de novo.  However, underlying factual findings, including prejudice, are reviewed for clear error." (citations omitted)); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) ("We review the legal standard for prejudice articulated by the Claims Court de novo, and we review the Claims Court's underlying factual findings for clear error." (citing *Bannum*, 404 F.3d at 1353–54)).[21]

---

conducting a trial on a paper record" and "will then determine whether a party has met its burden of proof based on the evidence in the record" (citing *Bannum*, 404 F.3d at 1354–55)); *Karthik Consulting, LLC v. United States*, 168 Fed. Cl. 95, 103 (2023) ("The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision.").

[21] *See also Off. Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020) ("Prejudice is a question of fact that we review for clear error." (citing *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1359 (Fed. Cir. 2018)); *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 225 (Fed. Cir. 2019) ("Prejudice is a question of fact, and we review the findings of the Court of Federal Claims thereon for clear error."); *Diaz v. United States*, 853 F.3d 1355, 1359 (Fed. Cir. 2017) ("Prejudice is a factual question that we review for clear error." (citing *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1357–58 (Fed. Cir. 2015))); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) ("Unlike other issues in this case,

IV.    DISCUSSION

Golden asserts that the EPA improperly evaluated Golden's proposed key personnel.  This assertion does not rest on an alleged government transgression of a particular statute, regulation, or RFQ provision (*i.e.*, that the government failed to do something required or did something prohibited).  Rather, Golden's complaint is that the EPA's assessment of Golden's key personnel is arbitrary and capricious — either because the EPA is wrong given the facts substantiated in the administrative record, or because the record is devoid of the precise rationale that the government now invokes.  At a minimum, Golden maintains that this Court must remand this matter to the EPA for the agency to provide a new or expanded explanation for its evaluation.

When viewed through the proper deference lens, however, this Court is convinced that:  (1) Golden fails to carry its burden to show that the EPA made any factual findings that are erroneous or unsupported by the administrative record; (2) Golden fails to carry its burden to demonstrate that the EPA's assessment of Golden's proposed key personnel was arbitrary and capricious in light of the administrative record; and (3) even assuming that the administrative record is far less detailed than the rationale the government now asserts before this Court, Golden still fails to carry its burden to demonstrate prejudice or that a remand is warranted.  Before addressing those three issues, this Court first explains how Golden's arguments should be characterized and analyzed in light of the APA standard of review.

A.    Refining the Standard of Review in the Context of Golden's Arguments

Given the APA's standard of review applied in post-award procurement challenges, 28 U.S.C. § 1491(b)(4), government procurement challenges may generally be categorized into three buckets:

(1) A statute, regulation, or solicitation provision mandates an agency to take an action — *e.g.*, a requirement is imposed via the word "shall"[22] — but a plaintiff claims that the government has violated the provision by not complying with its requirement.  In such a case, the trial court's review of agency action is effectively *de novo* because the trial court is charged with deciding what the

---

prejudice is a question of fact that this court reviews for clear error.").

[22] *See* FAR 2.101 ("*Shall* denotes the imperative.");

provision requires as a matter of law and then assessing the government's compliance given the court's fact finding based upon the administrative record.[23]

(2) A statute, regulation, or solicitation provision provides an agency with discretion to take (or not take) a particular action or to make a particular decision. Such discretion may be conferred expressly — *e.g.*, using the term "may"[24] — or implicitly, where the provision contemplates some assessment of facts and/or their implication. Either way, the trial court must determine whether the agency's action, decision, or assessment is reasonable (*i.e.*, not arbitrary and capricious) in light of the administrative record. Even where an agency has broad discretion, "a statute or regulation may provide a substantive yardstick against which an agency's exercise of discretion may be measured or impose a related procedural requirement." *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 107–08 (2020); *see also Consol. Safety Servs., Inc. v. United States*, 167 Fed. Cl. 543, 555 (2023) (discussing "the substantive yardsticks this Court must use to assess the [a]gency's [decision]").

(3) A hybrid situation in which a statutory, regulatory, or solicitation provision *requires* a particular analysis or assessment — and even specifies what factors *shall* be considered — but the ultimate decision or conclusion is still left up to an agency's sound judgment. *See, e.g., Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 283 (2024) (explaining that while FAR 14.408-2 mandates a price reasonableness determination, "[t]hat FAR provision does

---

[23] *See, e.g., Elevated Techs., Inc. v. United States*, 160 Fed. Cl. 257, 272 (2022) (holding that an RFQ's "express provision mandating" particular agency action "eliminated the [agency's] typical flexibility and required it to uniformly disqualify contractors for noncompliance"); *MG Altus Apache Co. v. United States*, 111 Fed. Cl. 425, 441 (2013) ("Had the record supported a finding that [two companies] were affiliates, the FAR would have required the contracting officer to have considered [the related party]'s past performance and integrity if they might have adversely affected the prospective contractor's responsibility.").

[24] *See* FAR 2.101 ("*May* denotes the permissive."); *Aeolus Sys., LLC v. United States*, 79 Fed. Cl. 1, 11 (2007) ("The regulation contains no mandating terms such as 'must' or 'shall,' but instead, uses language which, read in context, affords the agency discretion to make case-by-case determinations. It is true that the regulation does not use the term 'may,' which would have clearly indicated the permissive nature of the instruction . . . ."); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) ("The word 'shall' is ordinarily '[t]he language of command.' And when the same [r]ule uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense — the one act being permissive, the other mandatory." (citations omitted)).

not constrain the contracting officer in determining reasonability"). Even then, the record must "adequately explain" the agency's decision. *Mgmt. & Training Corp. v. United States*, 161 Fed. Cl. 578, 597 (2022) (discussing the requirement in FAR 15.305(a)(2)(ii) that "[t]he source selection authority shall determine the relevance of similar past performance information," and noting that "a court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment").

Courts have long recognized the fundamental distinction between the first bucket of APA claims and the latter two:

> An agency's action is contrary to law "[i]n the absence of statutory authorization for its act." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 944 (D.C. Cir. 2024) (quoting *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002)). And an agency's action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before [it]." [*Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020)] (second alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 2024 WL 3219481, at *4 (D.C. Cir. June 28, 2024), *cert. denied sub nom. Sault Ste. Marie Tribe of Chippewa Indians v. Burgum*, 2025 WL 1211788 (U.S. Apr. 28, 2025); *see also Hikvision*, 97 F.4th at 944 (distinguishing between a claim of illegality and "an arbitrary-and-capriciousness challenge"); *Mohammed v. Holder*, 47 F. Supp. 3d 1236, 1241 (D. Colo. 2014) ("The Court reviews legal questions *de novo*, but as to matters confined to the agency's discretion, the Court merely considers whether the agency has abused that discretion[.]").

More recently, the United States Supreme Court similarly observed:

> As a general matter, when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*. But when an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA]'s

> deferential arbitrary-and-capricious standard. Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable *and reasonably explained*.

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. --, 2025 WL 1520964, at *6 (May 29, 2025) (emphasis added) (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391–392 (2024)); *see also Acuna v. EEOC*, 2025 WL 685915, at *2 (Fed. Cir. Mar. 4, 2025) ("We exercise our 'independent judgment' about the correctness of an agency's statutory interpretation." (quoting *Loper Bright*, 603 U.S. at 412)).[25]

In sum, when examining an agency's actions under the APA, a court will generally consider: (1) whether the agency action is lawful (including whether the agency complied with procedural requirements); and (2) whether the agency adequately supported both its factual findings and discretionary decisions. A court reviews the first category *de novo*, and the latter pursuant to the APA's "arbitrary, capricious, [or] an abuse of discretion" standard. 5 U.S.C. § 706(2)(A).

The type of alleged agency error necessarily informs the prejudice analysis, as well as the proper scope of relief, assuming any is warranted. For example, where the agency entirely fails to undertake a mandatory analysis — and the administrative record evidence demonstrates that performing the required analysis might well have resulted in a different procurement outcome favorable to the plaintiff — the trial court should remand the case to the agency to perform the required analysis it did not do. On the other hand, where a plaintiff cannot explain why the government's failure to perform a required analysis impacted the procurement decision — or where the administrative

---

[25] And from this Court, Judge Davis has helpfully explained:

> The APA, however, "prescribes no deferen[ce]" to agencies' legal determinations. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 (2024) ("The APA . . . specifies that courts, not agencies, will decide '*all* relevant questions of law.'" (quoting 5 U.S.C. § 706)); *see also, e.g., Eagle Hill Consulting, LLC v. United States*, 171 Fed. Cl. 115, 129 (2024) ("[This Court] does not afford deference on questions of law." (citation omitted)). For example, the "interpretation of . . . procurement regulations presents [legal] questions" that get de novo review. *Eagle Hill Consulting*, 171 Fed. Cl. at 129 (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986)).

*Zolon PCS II, LLC v. United States*, 176 Fed. Cl. 279, 287 (2025).

record demonstrates that a proper analysis would result in the same adverse outcome for the plaintiff — the trial court may properly conclude that the legal violation constitutes harmless error (and no relief is warranted). *See Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 229 (Fed. Cir. 2019) (holding that the government's regulatory violation did not "affect[] the outcome of its decision" and thus the "Court of Federal Claims did not clearly err in finding that [plaintiff] failed to establish prejudicial error").

A similar analysis applies to an agency's factual findings and discretionary decisions that the trial court determines are arbitrary and capricious. The trial court may reach such a decision for one of several reasons. For example, the administrative record evidence might critically undermine an agency's factual findings or decisions.[26] Or perhaps the administrative record doesn't tend to show that the agency made an error, but the problem is simply that the agency's findings or decisions are conclusory or unexplained in the administrative record. Indeed, in the latter case, the APA requires the government to show its work. *Consol. Safety Servs., Inc. v. United States*, 167 Fed. Cl. 543, 564 n.11 (2023) (explaining that the government's failure to include "crucial calculation information is fatal" and that officials must "show [their] work"); *CAN Softtech, Inc. v. United States*, 2024 WL 4434253, at *6 (Fed. Cl. Oct. 4, 2024) ("The Court reviews claims of inadequate documentation under the APA's arbitrary and capricious standard.").[27] In the context of this case, the undersigned thus agrees with Judge Somers in *Tesla Laboratories, Inc. v. United States* that "a procuring agency must document and explain its basis for awarding a contract to a particular offeror with sufficient clarity even in FAR 8.4 procurements." 172 Fed. Cl. 505, 536 (2024) (discussing *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 607–10 (2023)). Where an agency's "evaluations [are] too truncated to

---

[26] *Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 148 (1st Cir. 2007) (explaining that "an agency's decision" is not arbitrary, capricious, or otherwise not in accordance with law "as long as it correctly explicates the governing law and turns on a *plausible rendition of the facts in the record*" (emphasis added)).

[27] "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–169 (1962) (internal quotation marks omitted)); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."). Put differently, "[t]he APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also RTD Middleburg Heights, LLC v. United States*, 172 Fed. Cl. 656, 670 (2024) ("Where an agency's failure to adequately explain a decision precludes effective judicial review, the typical remedy is to order the decision-maker to provide further explanation before determining the validity of the decision on the merits.").

demonstrate rationality under the relevant APA standard[,] [they] cannot pass muster no matter what amount of streamlined documentation FAR 8.4 permits." *Id.* at 537.   The proper course in these cases is for the trial court to remand the matter to the agency to redo or to reconsider its factual findings or discretionary decisions.  Alternatively, the agency must provide a rationale for its conclusions in the first instance.[28]

In general, then, a remand is the proper remedy where the ultimate outcome of the procurement is in some doubt in light of the arbitrary and capricious findings or determinations at issue.[29]  And a corollary principle is that the trial court cannot permit the government to supply a previously unarticulated rationale for the first time in the heat of litigation — that is, one not contained in the administrative record — to save the agency's decision.[30]  In procurement cases, this means that the government cannot "pil[e] up hypotheticals about future technical judgments and comparisons between offerors" and "ask[] this Court to preempt decisions committed to the Agency."  *22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 400 (2025).  In other words, "[j]ust as this Court cannot raise a technical rating based on a plaintiff's argument," this Court "cannot prospectively presume an unfavorable rating based on the government's argument."  *Id.* at 401.  At the same time, where the government demonstrates from the administrative record that the outcome of a remand would not change the results of the procurement, the plaintiff must do more than simply invoke the *Chenery* doctrine.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

Golden's challenge to the EPA's evaluation of Golden's proposed key personnel is plainly a complaint about either the agency's fact finding — its assessment of [KP]'s years of experience managing IT support service programs — or the agency's reasoned

---

[28] *Select Specialty Hospital-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 25 (D.D.C. 2011) ("The agency 'must cogently explain why it has exercised its discretion in a given manner,' and that explanation must be sufficient to enable the Court 'to conclude that the agency's action was the product of reasoned decisionmaking.'" (quoting *State Farm,* 463 U.S. at 48, 52)).

[29] *22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 400 (2025) ("[E]ven when this Court sets aside an agency action, it generally cannot determine what rating the agency should have applied.  As a result, instead of directing what ratings to apply and what contracts to award, this Court ordinarily must remand for further agency action." (citation omitted)).

[30] *Dep't of Com. v. New York*, 588 U.S. at 780 ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." (citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Camp v. Pitts*, 411 U.S. 138, 142–143 (1973) (*per curiam*)).

judgment about the meaning of those facts (*i.e.*, the negative risk the agency assessed based on its view of [KP]'s experience). Alternatively, Golden maintains that a remand is required to preclude the government from supplying in this litigation a post hoc justification for the EPA's procurement decision. Either way, this is *not* a situation in which Golden asserts a claim in the first bucket — that the agency somehow violated a statutory, regulatory, or solicitation provision. Accordingly, in applying the foregoing APA principles to questions of the EPA's fact finding or judgment, this Court's deference to the agency is at its apex.

### B.    The EPA Reasonably Determined that [KP] Lacked Required Qualifications and Evaluated Golden Accordingly

This Court rejects Golden's key personnel argument and finds that the administrative record, viewed as a whole,[31] adequately explains why Golden received a lower adjectival rating for Factor 2 (Technical Capability). The information Golden provided about [KP] in the Factor 2 part of its quote is inadequate to meet the key personnel requirements specified in TE 3-7. The EPA's technical evaluation team should not have to comb through [KP]'s resume — contained in yet another part of the quote (related to Factor 3) — to assess [KP]'s qualifications and years of experience. This Court thus agrees with the government that Golden's quote simply does not supply the necessary information to demonstrate that the EPA should have reached a different conclusion. *See* Def. Rep. at 5 ("Golden IT offers no argument or analysis in its response that addresses the Government's arguments concerning the insufficiency of [KP]'s cited experience.").

For starters, the narrative portions of Golden's quote simply do not focus on IT Support Service Programs — either quantitatively or qualitatively — and neither the government nor this Court is obligated to read [KP]'s resume in a manner that connects the dots between it and the RFQ's requirements. The fact that Golden's quote failed to explain how [KP]'s resume met the RFQ's requirements is Golden's problem, not the government's. In the alternative, Golden fails to demonstrate either prejudice or that a remand is warranted.

---

[31] *Cf. Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 148 (1st Cir. 2007) ("[T]he question [is] whether the agency, *on the record as a whole*, made a reasonable decision[.]" (emphasis added)); *see also Manago v. United States*, 164 Fed. Cl. 424, 436 (2023) (concluding that agency decision was "neither arbitrary and capricious, nor contrary to law, but was instead supported by substantial evidence *in the record as a whole*" (emphasis added)).

As explained above, the RFQ required quoters to identify an IDV Level Program Manager via several instructions in several different places. In "Volume II – Technical Section I" — the part of the quote addressing "Technical Capability (Factor 2)" — a quoter had to provide "its Technical Capability using the format in Attachment #5[.]" AR 1419 (RFQ § V.5.2.2). Attachment 5, in turn — referencing PWS § "3.1.4 Key Personnel" — indicated that "Offerors should provide one (1) resume for IDV level Program Manager (PgM) who shall be responsible for day-to-day oversight and management of the contract in accordance with MRITSS PWS 3.1.4 (Appendix 1) . . . ." AR 1518 ("Attachment 5 – Technical Factor 2 Matrix").

In response to questions from interested quoters, the EPA provided more detail about the key personnel requirement. One prospective quoter, for example, asked: "Are the[re] specific certifications the Program Manager needs to have *and are they required at proposal submittal* along with a resume?" AR 1244; *see also* AR 1433 (another question asking the agency to "confirm that the Phase II submission does not require Key Personnel resumes"). The EPA responded by referring potential quoters to the "updated TE 3[-]7 for IDV Program Manager requirements." AR 1244;[32] *see also* AR 1433.[33]

The TE 3-7 document ("Staffing Plan and Key Personnel"), in turn, explained that the IDV Level Program Manager would be "[r]esponsible for day-to-day oversight and management of the contract." AR 9567. It further specified mandatory qualifications for program managers, which included an education requirement, certification requirements, experience level requirements, and a minimum clearance level. AR 9567–68.[34] Critically, for Golden's case, the experience level requirement included "10 years of experience managing IT Support Service Programs with similar scope and complexity" to MRITSS. AR 9567. Nothing in the RFQ constrained the EPA's discretion to assess a proposed manager's years of experience in some specific manner. In such a case, the agency's assessment must only be rational for this Court to uphold it. *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 450 (2022) ("The Solicitation's silence grants the agency

---

[32] "TE" stands for "Technical Exhibit." *See supra* note 9.

[33] Again, agency answers to offeror questions effectively amend a solicitation. *See supra* note 10.

[34] The government did *not* consider these requirements to constitute mandatory minimum requirements, such that a quote's failure to meet them would render the quote unawardable *per se*. *See Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 537 (2013) ("Determining whether a requirement of the Solicitation is considered a material requirement is a matter within the [a]gency's discretion.").

discretion to consider what amounts to 'multi-disciplinary' experience as long as it does so rationally." (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1355–56 (Fed. Cir. 2004))).  Golden points to nothing that demonstrates that the EPA's evaluation is unreasonable or irrational.

To meet the program manager key personnel requirement, Golden proposed [KP].  AR 4599 (Golden's Quote, Phase II, Vol. I, § 2.1).  In a section of Golden's quote entitled "Key Personnel Resume," Golden indicated that [KP] "is a certified project management professional and holds additional certifications for ITIL v4 and Scrum with 20 years of experience as a federal government contractor at multiple Departments."  AR 4611 (Golden's Quote, Phase II, Vol. I, § 2.3).  Golden's quote further describes [KP]'s general experience managing federal government contracts, but the quote nowhere expressly addresses whether or how [KP] has "10 years of experience managing *IT Support Service Programs*." AR 9567 (emphasis added).  Golden's quote further notes that [KP]'s "resume is included in Appendix A of this document."  AR 4611 (emphasis omitted); *see also* AR 4627-29 (Resume of "[KP]").[35]

Before turning to the EPA's evaluation of [KP]'s qualifications, this Court reiterates that [KP]'s resume simply does *not* contain a self-evident demonstration or description of "experience managing IT Support Service Programs."  AR 9567.  [KP]'s resume *does* contain a "Highlights" section, indicating that [KP] has "20 years of experience *on software development projects* at multiple government agencies."  AR 4627 (emphasis added).  And that section of [KP]'s resume further notes [KP]'s "[e]xtensive experience in technical writing, business analysis, project, delivery, and program management," as well as [KP]'s "[s]olid understanding of project management and methodologies[.]"  *Id.*  But nowhere does [KP]'s resume quantify or otherwise summarize — in either a quantitative or qualitative sense — [KP]'s experience "managing IT Support Service Programs." AR 9567.  Indeed, a reader — such as an EPA evaluator or this Court — trying to figure out how [KP]'s years of such experience is on his or her own to make that assessment or perform a calculation.  Golden's completed Attachment 5 (the "Technical Factor 2 Matrix") does not supply any additional, helpful details.  *See* AR 4650 (noting again [KP]'s "20 years of experience as a federal government contractor" but not addressing experience managing IT support services).

---

[35] Golden apparently misspelled its proposed program manager's name as [* * *] when providing [KP]'s resume; everywhere else it is spelled "[KP]."

Considering that factual background, the EPA's technical evaluation of Golden's proposed key personnel is hardly surprising. The TEP's assessment of [KP] concluded that [KP] did "not meet the requirement as described in the PWS." AR 6883 (emphasis omitted). The TEP acknowledged that [KP] has "20 years of experience working on software development projects at multiple government agencies" and various other professional qualifications (*e.g.*, degrees and certifications). *Id.* But there was a fatal flaw with [KP]'s resume, in the agency's view: while [KP] "has a heavy [software] development background," [KP] "does not have cited experience managing IT Support Service Programs with similar scope and complexity to MRITSS and experience managing teams of IT professionals supporting a large area of operations." *Id.* Accordingly, the TEP recommended that Golden be "eliminated from further [Phase II] consideration" (along with four other quoters). AR 7044.

The contracting officer's best value determination tracks the TEP's assessment of [KP]. AR 7090. The contracting officer went further, though, and elaborated on two negative consequences that could flow from [KP]'s lack of experience:

- "The risk associated with this lack of experience to programs with similar scope and complexity to MRITSS is that the key personnel would not be able to efficiently manage this product and ensure compliance with the PWS and terms/conditions of the contract." AR 7090.

- "One . . . insufficienc[y] was for [PWS §] 3.1.[4] Key Personnel, which is a critical role under this requirement; without a qualified key personnel who can properly manage this contract and subsequent task orders, the risk to the Government is as follows: potential poor contractor performance, inexcusable delays in service, and loss of Government resources (time, labor, funds)." *Id.* [36]

Accordingly, the contracting officer, in her best value determination, assigned Golden a rating of "Some Confidence" for Factor 2 (Technical Capability). AR 7068; *see also* AR 7088. The best value determination similarly notes that Golden received an *overall* consensus rating of just "Some Confidence," when considering the totality of the ratings for Factor 2 (Technical Capability), Factor 3 (Management Approach), and Factor 4 (Past Performance). AR 7122. Ultimately, the contracting officer determined that Golden was

---

[36] The contracting officer cited to the same Section "3.1.3.2" that the TEP report cited to when evaluating Golden's key personnel, *see* AR 6883. As noted, *see* note 15, *supra*, there is no § 3.1.3.2 of the PWS; "key personnel" is found in § 3.1.4. AR 1264.

not amongst the offerors which would "provide the best value to the Government[.]" AR 7123.  Indeed, the contracting officer explained in her report that all of the offerors who "will be awarded blanket purchasing agreements" were those who "received an overall consensus rating of 'high confidence.'"  *Id.*  In discussing why Golden was not awarded a BPA, the contracting officer repeated the findings discussed above regarding Golden's proposed program manager, [KP].  AR 7144–45.

In challenging Golden's "Some Confidence" rating for Factor 2 (Technical Capability), Golden argues that "the Agency ignored cited examples of [KP]'s management experience on projects with similar size, scope, and complexity to MRITSS and experience managing teams[.]"  Pl. MJAR at 15.  Golden, in support of its argument, summarizes some verbiage from its quote, but only one example of [KP]'s experience is from the quote narrative itself.  *See* Pl. MJAR at 15–16 (citing AR 4611).  The rest of the information Golden relies on in support of its argument is summarized from [KP]'s resume.  *Id.* (citing AR 4627-29).  But, as explained *supra*, [KP]'s resume is open to considerable interpretation; it does not self-evidently demonstrate that [KP] meets the RFQ's key personnel requirements enumerated in TE 3-7.

Moreover, the government correctly responds that Golden completely whiffed the government's argument, which critiqued [KP] for [KP]'s insufficient years of experience performing a specific type of work, not for the general nature of the contracts that [KP] previously supported.  In that regard, the government's MJAR explains that [KP] lacks the requisite "*10 years of experience* managing IT Support Service Programs with similar scope and complexity" to the MRITSS.  Def. MJAR at 22 (emphasis added) (citing AR 9567).  According to the government, even if all of [KP]'s *relevant* projects are considered, "the sum of [KP]'s experiences . . . reflects a total of only five years and three months of management-related experience" — very much shy of the "10 years of experience" requirement.  *Id.*

The government further notes that even under a more favorable calculation, [KP] only gets to "eight years and six months."  Def. MJAR at 22 n.7.  Similarly, defendant-intervenor CCS Lintech persuasively argues that "even if one accepts all of Golden's arguments as true — that all four [resume] entries [Golden cites] represent experience 'managing IT Support Services Programs with similar scope and complexity' to MRITSS — it adds up to 7 years and 1 month, which is *less than the 10 years* of experience required by the PWS."  CCSL MJAR at 21.  Under an even *more* favorable calculation, [KP] only

gets to "9 years and 8 months" of required experience — and thus Golden "still fails to demonstrate [KP]'s resume showed at least 10 years" of the requisite experience. *Id.*

Golden responds to precisely *none* of those adverse calculations in its reply brief. Tr. 91:4-7 (Golden's counsel agreeing that "we did not address a 10-year [experience] requirement").[37]  Instead, Golden rests on a legal argument: that the EPA's "analysis consists of a single conclusory sentence finding [KP]'s experience insufficient."  Pl. Rep. at 5; *see also* Tr. 10:11 – 11:5 (arguing "that's not something that the Government can raise in a briefing").  Golden's point is that the EPA's evaluation documents (*e.g.*, the TEP report and contracting officer's report) do not contain any quantitative analysis regarding [KP]'s years of experience.  Pl. Rep. at 5 (arguing that "[t]here is nothing about a number of years" in the administrative record).  In essence, Golden posits that the supposedly missing rationale from the administrative record renders the agency's decision arbitrary and capricious, thereby entitling Golden to a remand for the EPA to reconsider its conclusion in a new award decision or to otherwise supply the missing rationale.  This Court next turns to that issue.

### C.    Golden Fails to Demonstrate Prejudice

Even if Golden had demonstrated that the government's evaluation contained insufficient analysis — and is thus arbitrary and capricious — Golden is not entitled to any relief unless Golden further demonstrates that the error is prejudicial.  Here, that means proving a not-insubstantial chance of a different outcome in this procurement (*i.e.*, if the EPA is ordered to redo the key personnel evaluation on remand).  *Ekagra Partners, LLC v. United States*, 163 Fed. Cl. 189, 207 (2022) (discussing *Info. Tech. & Applications Corp.*, 316 F.3d at 1319).  That, in turn, means that Golden was required to at least suggest a plausible analysis of its quote that could shift the final award calculus in Golden's favor on remand to the EPA.  *Reli Grp., Inc. v. United States*, 174 Fed. Cl. 630, 642 (2025) ("[T]he protestor must show that, at a minimum, its chances of contract award would have increased but for the error.").

---

[37] This Court deems the argument waived.  *See* Tr. 7:21 – 12:8 (Golden's counsel conceding that it did not provide this Court with a counter-calculation); *see also Sparksoft Corp. v. United States*, 167 Fed. Cl. 694, 707 (2023) ("It is black-letter law that arguments not raised in opening or responsive briefing are waived." (citing *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver."))).

At a minimum, Golden does not prevail because it fails to meet its burden of proof. That is particularly true given that neither Golden's quote nor its briefs explain *how* and *why* the resume *must* be read to meet the RFQ's requirements. Golden has the burden to demonstrate prejudicial error from the administrative record — *i.e.*, to show that there is a not-insubstantial chance that the outcome of the procurement would be different on remand. *Sys. Stud. & Simulation,* 22 F.4th at 996–97 ("[T]he challenger of agency action generally bears the burden of showing that an error was harmful — that is, that it was prejudicial."). But where, as here, the government and defendant-intervenors posit calculations demonstrating that [KP] simply does not have the requisite experience, and those calculations support the agency's evaluation that [KP] is not qualified — and at least *that* conclusion *is itself* contained in the administrative record — there is no basis for this Court to find prejudicial error.

The government and intervenors, moreover, demonstrated that no matter how [KP]'s experience is counted,[KP] falls short of the experience the RFQ required. Whether that means Golden fails to meet its burden to prove prejudicial error[38] or that the government and intervenors have carried their burden to demonstrate harmless error[39] — either way — Golden loses.

---

[38] Section 706 of the APA commands that, when a court hears a challenge to an agency action, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. The Supreme Court has held that the § 706 "rule of prejudicial error" requires application of a traditional harmless-error analysis, and that the person seeking relief from the error has the burden of showing prejudice caused by the error. *Shinseki*, 556 U.S. at 406, 409. Again, this rule applies equally in procurement challenges pursuant to 28 U.S.C. § 1491(b). *See WellPoint Mil. Care Corp.*, 953 F.3d at 1381 (noting that "the Supreme Court explained in *Sanders* that the mere possibility of harm is insufficient to rise to the level of prejudicial error"); *Sys. Stud.*, 22 F.4th at 998 ("[W]e conclude that the Claims Court did not err when it determined that the irrational assignment of the particular strength at issue . . . was harmless error."); *Suntec Indus. Co. v. United States*, 857 F.3d 1363, 1368 (Fed. Cir. 2017) ("The Supreme Court has held that the [APA] § 706 'rule of prejudicial error' command requires application of a traditional harmless-error analysis and that the person seeking relief from the error has the burden of showing prejudice caused by the error." (citing *Shinseki*, 556 U.S. at 406, 409)); *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1329–31 (Fed. Cir. 2013) (holding, in an APA case, that "the trial court correctly concluded that [the plaintiff] did not present sufficient evidence of prejudice to create a triable issue of fact regarding prejudice from the government's procedural error"); *Marathon Targets, Inc. v. United States*, 175 Fed. Cl. 725, 738 (2025) ("Plaintiff does not demonstrate harm because it does not explain what additional response it would have provided to the [contracting officer].").

[39] *See Keltner v. United States*, 165 Fed. Cl. 484, 517 (2023) (explaining that where a plaintiff has demonstrated error, "the government has the burden to demonstrate harmless error" (citing cases)); *see also Wisotsky v. United States*, 69 Fed. Cl. 299, 307 n.7 (2006) ("The burden to produce such substantial evidence that the error was harmless is on the government.").

This Court thus finds, *as a matter of unrefuted fact*, that [KP]'s experience is fatally lacking, just as the EPA found (notwithstanding that its stated rationale is not as fulsome as it could have been). Simply put, Golden proposes no calculation of [KP]'s IT experience to counter the government's or intervenors' calculations. *Bannum*, 404 F.3d at 1358 ("There is nothing besides [plaintiff's] conjecture to support the contention that another review, comporting with the FAR, would provide [plaintiff] a substantial chance of prevailing in the bid. [Plaintiff]'s argument rests on mere numerical possibility, not evidence."). Golden's failure to rebut those calculations — or to even attempt to do so — means that Golden cannot prevail on prejudice. *Cf. Great Am. Ins. Co. of New York*, 738 F.3d at 1329–31 (affirming that [plaintiff] "did not present sufficient evidence of prejudice to create a triable issue of fact regarding prejudice from the government's procedural error").

## D. Golden Has Not Justified a Remand

Even assuming that the agency's evaluation of Golden's key personnel lacks critical details (that are more fully explicated only in the government's and defendant-intervenor's respective briefs), this Court concludes that such an error is at most harmless because *Chenery* does not "require an agency to crystallize its basis of decision into a single, rarefied reason." *Stanley Works v. FTC*, 469 F.2d 498, 503 (2d Cir. 1972). Instead, "[a]ll that is required is that '[i]f the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.'" *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

The government's argument before this Court is *not* fundamentally different from the rationale that the agency provided in the administrative record for its procurement decisions. *See, e.g.*, *Guevara v. Zanotti*, 399 F. Supp. 3d 494, 503 (E.D. Va. 2019) ("[T]he *Chenery* rule is not violated because the grounds relied upon by [the agency] do not differ from the reasons cited here [before the court] in support of [the agency]'s decision[.]"). A remand here for the EPA simply to provide a further gloss on its evaluation already contained in the administrative record would serve no purpose, particularly because Golden offers no response to the criticism that [KP] *in fact* lacks the requisite 10 years of specific IT management experience.

The Federal Circuit's decision in *Oracle America, Inc. v. United States*, 975 F.3d 1279, 1285, 1291 (Fed. Cir. 2020), supports this Court's conclusion that Golden has not

demonstrated that a remand is warranted in this case.  In *Oracle*, the Federal Circuit noted that "[t]he Supreme Court has referred to the *Chenery* doctrine as embodying a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *Oracle*, 975 F.3d at 1290 (cleaned up) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015))).  But *Chenery* "does not invariably require a remand to the agency" for every APA violation:

> As the Supreme Court, this court, and other circuit courts have recognized, principles of harmless error apply to judicial review of agency action generally.  A remand is unnecessary when the error in question "clearly had no bearing on the procedure used or the substance of decision reached," *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964); if there is no reason to believe that the decision would have been different, *In re Watts*, 354 F.3d 1362, 1370 (Fed. Cir. 2004); if it is clear that the agency would have reached the same result, *Fleshman v. West*, 138 F.3d 1429, 1433 (Fed. Cir. 1998); if the result is "foreordained," *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984); if the court is not "in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed," *Kurzon v. U.S. Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976); or where there is no "significant chance that but for the error, the agency might have reached a different result," *NLRB v. Am. Geri-Care, Inc.*, 697 F.2d 56, 64 (2d Cir. 1982).

*Oracle*, 975 F.3d at 1290–91.

Applying those rules, the Federal Circuit in *Oracle* held that "[i]n light of the ***Claims Court's careful consideration of the record evidence***, the [trial] court's conclusion . . . that Oracle . . . would not have had a substantial chance of securing the contract, is not clearly erroneous."  *Oracle*, 975 F.3d at 1291–92 (emphasis added).  Accordingly, our appellate court declined to "disturb the Claims Court's determination that the case did not need to be remanded to the Defense Department for a further determination[.]"  *Id.* at 1292.  In so holding, the Federal Circuit reiterated that it "review[s] a finding of prejudice or no prejudice by the Claims Court in a trial on an administrative record under

the clearly erroneous standard." *Id.* at 1291 (citing cases); [40] *see also FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 928–29 (2025) ("The most natural interpretation of the APA's language is thus that reviewing courts should adapt the 'rule of prejudicial error' applicable in ordinary civil litigation (also known as the harmless-error rule) to the administrative-law context.").

*Oracle* remains good law. *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 277 (2024) (explaining that "mounds of Federal Circuit case law instruct[] this Court: (1) to make findings of fact based on the administrative record pursuant to this Court's rule governing motions for judgment on the administrative record, RCFC 52.1; and (2) to do so specifically regarding prejudice"); *see also Newhouse v. Nicholson*, 497 F.3d 1298, 1301 (Fed. Cir. 2007) (holding "the *Chenery* doctrine is not implicated" where the trial court is charged with determining whether an "[agency] error is prejudicial or harmless"); *Aguilar v. Garland*, 60 F.4th 401, 407 (8th Cir. 2023) ("[T]he *Chenery* doctrine doesn't prohibit courts from considering whether an agency error is harmless.").[41]

This Court *perhaps* may have sided with Golden if, in order to defend against other allegations of error, the government had concluded for the first time *in this litigation* that Golden's proposed key personnel rendered its quote unawardable (or justified a lower technical rating). For example, if the EPA's evaluation had made no mention of key personnel, but the government nevertheless defended its overall decision not to award Golden a BPA based on the government's argument that [KP], in fact, flunked certain RFQ requirements, Golden might well have had a good point.[42] On the one hand, if in this hypothetical, the record contained facts conclusively demonstrating that the government was correct, this Court may be able to consider the government's assertion

---

[40] The Federal Circuit cited *Office Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020); *CliniComp*, 904 F.3d at 1359; *Diaz*, 853 F.3d at 1359; and *Bannum*, 404 F.3d at 1354. In each case, the Federal Circuit held that "[p]rejudice is a question of fact that we review for clear error." 951 F.3d at 1374; *see CliniComp*, 904 F.3d at 1359 (holding that "[p]ejudice is a fact question," finding "no clear error," and "therefore conclud[ing] that CliniComp lacks standing in this bid protest").

[41] *But see FDA*, 145 S. Ct. 928–31 (2025) ("There is . . . obviously tension between . . . the remand and harmless-error rules.").

[42] *See, e.g., Gemini Tech Servs., LLC v. United States*, -- Fed. Cl. --, 2025 WL 1304206, at *5 (Apr. 18, 2025) (holding that the government violated FAR 15.306(c)(1) where "the record does not contain *any* analysis of how or why the offerors included in the Army's competitive range were considered the most highly rated against the technical acceptability factor" and that "[t]he limited, and at times conflicting, documentation of the Army's decision-making compounds this error").

even if raised for the first time during litigation. *Tadlock v. McDonough*, 5 F.4th 1327, 1336–37 (Fed. Cir. 2021) (explaining that a court "may affirm [agency action] on a ground not considered by the [agency] if it is clear that the factual basis for such conclusion is not open to debate and the [agency] on remand could not have reached any other determination"). On the other hand, where a solicitation calls for an agency's discretionary judgment about the qualifications of key personnel, and the administrative record is entirely silent on the subject, that is likely *not* a judgment this Court could make in the first instance. *Superior Waste Mgmt.*, 169 Fed. Cl. at 266–67 (discussing *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023)); *id.* at 278 (explaining that "*CACI* is, on its facts, something of an outlier case because the OCI situation is unique — or at least relatively rare — due to regulations that govern OCI determinations but are not present in most bid protest cases"); *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017) (explaining that an agency's decision must "set forth a sufficiently detailed explanation of its determinations both to enable meaningful judicial review and to prevent judicial intrusion on agency authority").

But here, the EPA's procurement record is sufficiently detailed to justify the EPA's having given Golden a lower rating for Factor 2. And, in any event, Golden fails to address the unrebutted *fact* that a remand would not change the outcome of the government's finding that [KP] lacked the requisite "10 years of experience managing IT Support Service Programs." Accordingly, a remand of this matter to the EPA is unwarranted even if this Court had found the administrative record lacking.[43]

---

[43] In *Beverly Health & Rehab. Servs., Inc. v. Thompson*, the United States District Court for the District of Columbia similarly explained:

> "[R]eversal and remand are [not] required each and every time an administrative agency assigns a wrong reason for its action; rather, it requires reversal and remand *only* where there is a significant chance that but for the error, the agency might have reached a different result." *N.L.R.B. v. American Geri–Care, Inc.*, 697 F.2d 56, 64 (2d Cir. 1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983) (emphasis added). *See also Envirocare of Utah, Inc. v. Nuclear Regulatory Comm.*, 194 F.3d 72, 79 (D.C. Cir. 1999) ("In the absence of such a possibility, affirmance entails neither an improper judicial invasion of the administrative province nor a dispensation of the agency from normal responsibility.") (quoting Henry J. Friendly, *Chenery Revisited: Reflecting on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 211).

223 F. Supp. 2d 73, 115 n.46 (D.D.C. 2002). In this case, Golden fails to demonstrate any substantive error in the agency's evaluation of quotes. That is, Golden does not prove that the EPA "assign[ed] a wrong reason for its action," *id.*, or that administrative record is so inconclusive that this Court would be speculating about the result of any remand.

### E.    Golden Failed to Prove Unequal Treatment

Golden also asserts that the EPA engaged in unequal treatment of quoters' proposed key personnel.  Pl. MJAR at 21.  Golden agrees that the bar for such an argument is incredibly high and is governed by *Office Design Group v. United States*, 951 F.3d 1366 (Fed. Cir. 2020).  In that case, the Federal Circuit held that to prevail on such an argument, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or that "the agency inconsistently applied objective solicitation requirements."  *Id.* at 1372 (citing cases).   "If a protestor does not meet this threshold showing, then the court should dismiss the claim, otherwise it 'would give a court free reign [sic[44]] to second-guess the agency's discretionary determinations underlying its technical ratings.'"  *AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 362 (2023) (quoting *Office Design Grp.*, 951 F.3d at 1373).

For example, if one offeror proposes to use a certain computer system and received a strength in the evaluation, it might well be arbitrary and capricious for the government to downgrade another offeror proposing to use that same system in the same way (*i.e.*, assuming no other material distinctions are evident in the proposals regarding the use of that system).  But key personnel are not analogous to some specific software or system.  That is, named key personnel are inherently different — they're specific people after all — and resumes are by their nature very rarely "substantively indistinguishable" from each other.  *Office Design Grp.*, 951 F.3d at 1372.  Almost by definition, then, they cannot be considered "nearly identical."  *Id.* at 1371; *see also CACI*, 67 F.4th at 1155 (noting that "CACI had the burden of showing that the two [competing] solutions are 'substantively indistinguishable,' a burden CACI failed to meet").

Sure, this Court can imagine a solicitation containing a clearly objective key personnel requirement subject to a binary evaluation.  For example, where a solicitation requires that key personnel possess an MBA degree, a proposed individual either has the degree or doesn't.  The government cannot likely give one offeror a pass for proposing someone with a master's degree in another field (in lieu of an MBA), while simultaneously downgrading a competitor for the same or similar sort of substitution.  But short of such a clear, objective requirement, comparing the relative strengths of

---

[44] *See* https://www.merriam-webster.com/grammar/usage-free-rein-vs-free-reign (https://perma.cc/QC5E-2URY).

various resumes is necessarily a subjective — and, in this case, a technical — exercise in comparing apples and oranges.

Comparing the resumes at issue in this case requires substantive expertise that this Court lacks; concomitantly, the agency has broad discretion to assign different ratings to resumes that may appear very similar to someone without technical expertise in the key personnel's field. Thus, Golden's unequal treatment argument fails to even get off the ground. This Court agrees with the government, Def. MJAR at 25–30, that, as a factual matter, the awardees' proposed key personnel are sufficiently distinguishable from each other and [KP] such that this Court would be merely second guessing the agency if it were to side with Golden. *Cf. Ernst & Young LLP*, B-411728, 2015 CPD ¶ 318, 2015 WL 6501468 at *8 (Comp. Gen. Oct. 14, 2015) (explaining that protestor's "key personnel resumes provided only overall years of experience in accounting/auditing, and did not delineate specific years of experience in each desired qualification area, which prevented the evaluators from plainly determining the candidates' years of experience in various desired qualification areas"). In sum, Golden fails to persuade this Court that the government committed prejudicial error in declining to award Golden a BPA.

* * * *

Golden argues that the EPA committed two other errors in the procurement, Pl. MJAR at 11, but this Court sees no reason to reach those arguments given Golden's failure to prevail on the key personnel issue. That is because Golden repeatedly conceded that, in order to demonstrate prejudice on the merits, Golden must prove that the EPA's evaluation process was plagued with all three of the technical evaluation errors that Golden alleges. *See* Am. Compl. at ¶ 98 ("Without *these three evaluation errors*, Golden would have no insufficient experience." (emphasis added)). Counsel for Golden admitted as much during oral argument:

> **THE COURT:** . . . It seems like you agree . . . that to demonstrate prejudice on factor 2, you have to win all three subsidiary issues.

> **[GOLDEN'S COUNSEL]:** Your Honor, that is what we pled. After thinking about it, I'm not sure I believe that, but that is what's in the pleadings.

> **THE COURT:** Okay. We're going to stick with what's in the materials that have been submitted. Did you ever argue to the contrary anywhere in the briefs?
>
> **[GOLDEN'S COUNSEL]:** No.

Tr. 5:21 – 6:7; *see also* Tr. 56:8–18 (Golden's counsel agreeing that "if [the Court] decide[s] . . . that we cannot win on this [key personnel] count, . . . then I'm not sure that there's anything else we can do, because there are three counts and we do say we have to be successful on all three"); Pl. MJAR at 30 ("*Without these three evaluation errors*, Golden would have had no insufficient experience." (emphasis added)).

Because Golden fails to demonstrate that the government improperly evaluated Golden's proposed key personnel for the IDV Level Program Manager position, Golden loses its case.[45]

## V.    CONCLUSION

The Clerk is directed to enter **JUDGMENT** for Defendant, the United States, and Defendant-Intervenors, AccelGov, LLC and CCS Lintech JV, LLC. Golden's MJAR is **DENIED**. Because ASRC withdrew its MJAR and supporting briefs, ASRC is **DISMISSED** from this case.

---

[45] This Court further rejects Golden's Count II, in which Golden asserts that the EPA used an arbitrary "cutline" for awards. Am. Compl. ¶¶ 102–111; Pl. MJAR 31–34. Golden's argument is remarkably underdeveloped. Golden nowhere explains how the "cutline" violates the RFQ's terms. Golden further admits that the RFQ required the EPA to award contracts to quoters "whose quotes represented the best value to the Agency *as determined by the highest technically rated quote* with a fair and reasonable price." Am. Compl. ¶ 39 (emphasis added); *see also* AR 1424 (best value is determined by "Highest Technically Rated Quoters with a Fair and Reasonable Price"). Golden loses this argument for three succinct reasons. First, Golden has not demonstrated that its technical rating was flawed. Second, Golden was not one of the highest technically rated quoters, a determination left to the agency's broad discretion. And third, the RFQ put Golden on notice that the number of awards would be limited. *See* AR 1425 ("The Government anticipates awarding 6–8 BPAs."). The line the EPA drew in this procurement is self-evidently rational. At best, Golden's complaint is with the government's interpretation of "Highest Technically Rated Quoters." But if Golden wanted to complain about that term's ambiguity, Golden should have done so prior to the quote submission deadline. *See Blue & Gold*, 492 F.3d at 1313.

**IT IS SO ORDERED**.

<u>s/Matthew H. Solomson</u>
Matthew H. Solomson
Chief Judge